IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROGER B. SIPPEY, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )   No. 18 C 6744 |
| | ) |
| COOPER TECHNICA, INC. and COOPER | )   Magistrate Judge Finnegan |
| TECHNICA LIMITED PARTNERSHIP #2 | ) |
| | ) |
|     Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Roger B. Sippey ("Plaintiff" or "Sippey"), as co-trustee of the Roger B. and Janet H. Sippey Revocable Trust of 2017 ("Trust"), moves for summary judgment in this lawsuit against Defendants Cooper Technica, Inc. ("CT") and Cooper Technica Limited Partnership #2 ("CTLP") (collectively, "Defendants") alleging failure to fully repay a loan in breach of contract. (Doc. 12). For reasons discussed below, the motion is granted as to liability.[1]

## BACKGROUND[2]

---

[1] After fully briefing Plaintiff's Motion for Summary Judgment (Doc. 41), the parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 76). After the case was reassigned, this Court requested additional information from the parties to ascertain subject matter jurisdiction. (Docs. 78, 81-87). Ultimately, the Court satisfied itself that diversity jurisdiction exists. (Doc. 88).

[2] In accordance with Local Rule 56.1, the following facts are undisputed and are drawn from Plaintiff's Rule 56.1 Statement of Facts (Doc. 43), Defendants' Response to Plaintiff's Statement of Facts (Doc. 64-1, at 1-3), Defendants' Statement of Facts (Doc. 64-1, at 3-4), and exhibits submitted by the parties in support of their factual statements. L.R. 56.1(a)(3), (b)(3)(B). Because Plaintiff failed to respond to Defendants' Statement of Facts pursuant to Local Rule 56.1(b)(3)(C), they are deemed admitted but only to extent that they are properly supported and do not assert legal argument. *See Gabryszak v. Aurora Bull Dog Co.*, 427 F. Supp. 3d 994, 999 (N.D. Ill. 2019) (deeming opposing party's additional facts admitted "to the extent they are properly supported by specific citations to evidence" where movant failed to respond); *Gee v. Dart*, No. 16 C 3061, 2017 WL 4699237, at *1-2 (N.D. Ill. Oct. 19, 2017) ("Generally, the purpose of Local Rule 56.1 statements and responses is to identify the relevant admissible evidence supporting the

To avoid redundancy, and since the material facts in this case are straightforward and undisputed, the Court preliminarily provides only a brief overview of the facts and arguments. Later, as part of the analysis of each argument, a more detailed summary of the pertinent facts is provided.

RBS Processing Services, LLC ("RBS") (as "Lender") agreed to loan Defendants CT and CTLP (as "Borrowers") $105,000 pursuant to a Commercial Loan Agreement ("Loan Agreement") dated September 16, 2010. (Doc. 43-1, at 8-9; Doc. 43 ¶ 6; Doc. 43-1, at 3 ¶ 6; Doc. 43-2, at 3 ¶ 6; Doc. 64-1 ¶ 6). Sippey signed the Loan Agreement as manager of RBS, and David Cooper signed on behalf of Defendants. (Doc. 43-1, at 9; *see* Doc. 64-3 ¶ 1). Defendants "made some payments due under the Loan Agreement" (Doc. 43 ¶ 11; Doc. 64-1 ¶ 11; *see* Doc. 43-5 ¶ 4), with the last payment made in October 2017 for an amount that had been due by September 16, 2017. (Doc. 43-5 ¶¶ 5, 6; *see* Doc. 43 ¶ 12; Doc. 64-1 ¶ 12).

On October 4, 2018, an "Assignment of Commercial Loan Agreement" ("Assignment") was executed that said RBS assigned all of its rights, title, and interest under the Loan Agreement to the Trust effective December 1, 2017. (Doc. 43-3; *see* Doc. 43 ¶ 8; Doc. 64-1 ¶ 8). Sippey signed the Assignment both as the assignor (as manager of RBS) and as the assignee (as co-trustee of the Trust). (Doc. 43-3). Shortly thereafter, Sippey filed this breach-of-contract lawsuit on behalf of the Trust, seeking to recover the unpaid funds. (Doc. 1).

---

material facts, not to make factual or legal arguments."). Page numbers for all record citations are drawn from the CM/ECF docket entries at the top of the filed document.

Defendants do not deny that they borrowed $105,000 under the Loan Agreement and have repaid only some of the funds. They contend, however, that the Loan Agreement is not enforceable since it was unaccompanied by a promissory note and contains no "promise" to repay the loan; and, even had there been a promise to repay, Defendants need not do so until the collateral that secures the loan (two vehicles) has been sold. (Doc. 64, at 2-3). Defendants also assert that this action is not ripe since there has been no "presentment" and "notice of dishonor." (*Id.* at 3-4). Finally, Defendants argue that the Trust does not exist since it was not properly created and funded under Florida law, so is unable to bring this lawsuit. (*Id.* at 4-8).

## **DISCUSSION**

The parties agree that this case is suitable for summary judgment, though they disagree as to whether judgment should be entered in favor of Plaintiff or Defendants.[3] Summary judgment is appropriate where, as here, the materials in the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017); FED. R. CIV. P. 56(a), (c)(1)(A). The party opposing summary judgment "cannot merely rest on its pleadings; it must affirmatively demonstrate, by producing evidence that is more than 'merely colorable,' that there is a genuine issue for trial." *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 705 (7th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

---

[3] In their response to the Plaintiff's motion, Defendants conclude that the Court should grant them summary judgment (Doc. 64, at 1), but they have not filed a cross motion for summary judgment.

3

*Anderson*, 477 U.S. at 248. "Summary judgment is a particularly appropriate mechanism for resolving cases involving the interpretation of written contracts." *Urban 8 Fox Lake Corporation v. Nationwide Affordable Housing Fund 4, LLC, et al.*, 431 F. Supp. 3d 995, 998 (N.D. Ill. 2020) (citing *Internat'l Union of United Auto., Aerospace & Agric. Implement Workers of Am. v. Rockford Powertrain, Inc.*, 350 F.3d 698, 703 (7th Cir. 2003)).

**A.    Requirements for Breach of Contract**

The Loan Agreement expressly states that it "shall be governed by" Illinois law (Doc. 43-1, at 9 ¶ 6), and the parties agree that Illinois law governs the breach of contract claim. (*See* Doc. 44, at 4 (citing case applying Illinois law); Doc. 64, at 1). To succeed on a breach of contract claim under Illinois law, Plaintiff must show: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *See Reger Development, LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quotation omitted); *see also Cogswell v. CitiFinancial Mortg. Co., Inc.*, 624 F.3d 395, 398 (7th Cir. 2010) (setting forth elements as: "(1) an offer and acceptance; (2) consideration; (3) definite and certain terms; (4) performance by the plaintiff of all required conditions; (5) breach; and (6) damages caused by the breach."). To be enforceable, a contract must be "sufficiently definite so that its terms are reasonably certain and able to be determined." *Maurice Sporting Goods*, 2016 WL 4439948, at *2 (N.D. Ill. Aug. 23, 2016) (quotation omitted); *see also Cogswell*, 624 F.3d at 398.

**B.    Plaintiff's Arguments in Support of Summary Judgment**

In support of summary judgment, Plaintiff identifies the elements of a breach of contract claim, and sets forth undisputed evidence that satisfies each element as follows.

(Doc. 44, at 2-3; *see* Doc. 66, at 1-2). First, Plaintiff argues that the "existence, validity, and enforceability" of the contract is "not at issue" because Defendants "concede" that they and RBS executed the Loan Agreement and "admit" that they made payments thereunder. (Doc. 44, at 4-5). Second, Plaintiff asserts that RBS "fully performed its obligation" to lend Defendants $105,000 following execution of the Loan Agreement. (Doc. 44, at 5; *see* Doc. 66, at 1, 3).[4] Third, Plaintiff contends that Defendants breached the Loan Agreement because they have made no payments since October 2017 and failed to pay the Trust the outstanding balance due. (Doc. 44, at 5; *see* Doc. 66, at 1-3). Finally, Plaintiff notes that the Trust has incurred damages of unpaid principal and interest due under the Loan Agreement "in an amount [to be] determined at prove-up." (Doc. 44, at 5; *see* Doc. 66, at 2).[5]

## C. Defendants' Arguments in Opposition to Summary Judgment

### 1. **Loan Agreement is Not Enforceable**

Defendants first argue that the Loan Agreement is not enforceable because it is merely a "security agreement" that lacks any "promise" (as defined in Article 3 of the Uniform Commercial Code ("UCC")) by Defendants to repay the loan and is unaccompanied by a promissory note. (Doc. 64, at 2-3). Defendants introduce this argument by stating:

> A contract is generally a bilateral exchange of promises or a
> unilateral promise which can be invoked by a doing, and the
> same holds true for negotiable instruments. For this purpose,
> the term is defined in the Uniform Commercial Code.

---

[4] Plaintiff cites no support showing that $105,000 was transferred to Defendants in accordance with the terms of the Loan Agreement, but Defendants do not dispute this.

[5] Plaintiff initially sought attorneys' fees but acknowledges in the reply brief that such fees are not available as an element of damages under the Loan Agreement. (Doc. 66, at 2 n. 2).

(Doc. 64, at 2). Without further explanation, Defendants then quote from part of the definition section of Article 3 of the UCC as follows:

> "Promise" means a written undertaking to pay money signed by the person undertaking to pay. An acknowledgment of an obligation by the obligor is not a promise unless the obligor also undertakes to pay the obligation.

(Doc. 64, at 2, quoting 810 ILL. COMP. STAT. 5/3-103(a)(9)).

As a preliminary matter, Defendants make no analysis and cite no authority explaining how (if at all) Article 3 of the UCC applies in this case. In any event, while Paragraphs 3, 4, and 5 of the Loan Agreement relate to the collateral for the loan ("the Securing Property"), namely two vehicles to be held in escrow by Borrowers' counsel (the same counsel now representing Defendants in this lawsuit), Paragraphs 1 and 2 do not. (*See* Doc. 43-1, at 8-9). Since Paragraphs 1 and 2 of the Loan Agreement are central to the issues before the Court, they are quoted in full here:

> 1. Lender will lend to Borrowers, upon execution of this agreement, the sum of One Hundred Five Thousand dollars ($105,000.00), with interest calculated at the rate of ten percent (10 %) per annum, accrued interest payable not later than ten days after each anniversary date, all previously unpaid principal and interest due and payable in full no later than September 16rh [sic], 2014. In the event of any default in payment, all outstanding amounts shall carry interest at the rate of fifteen percent (15 %) per annum from the date first mentioned above until the default is cured.
>
> 2. Borrowers may pre-pay all or any part of the borrowed funds or accrued interest at any time without penalty: however, all principal and accrued interest shall fall due and be payable in full no later than at the sale of the last of the Securing Property described below.

6

(Doc. 43-1, at 8 ¶¶ 1, 2; *see* Doc. 43 ¶ 7; Doc. 43-1, at 3 ¶ 7; Doc. 43-2, at 3 ¶ 7; Doc. 64-1 ¶ 7).[6]

Defendants suggest that the Loan Agreement is unenforceable because the "language of" these paragraphs "is mandatory and personal as to [RBS's] obligation, but permissive and objective in regard to [Defendants]." (Doc. 64, at 2). Put another way, Defendants argue that "[t]he language acknowledges an obligation, but there is no language of undertaking or promise by the defendants." (*Id.*) To the extent Defendants contend that the Loan Agreement *obligated* Plaintiff to lend the $105,000 but merely *permitted* (rather than *required*) Defendants to repay the funds, the Court rejects this absurd construction of the Loan Agreement.

Paragraphs 1 and 2 plainly required Defendants to pay back the funds with interest, and Defendants promised to do so when they signed the agreement. Paragraph 1 provides that Defendants will pay the specified accrued interest "not later than ten days after each anniversary date[.]" (Doc. 43-1, at 8 ¶ 1). Paragraph 1 also declares, as Defendants admit, that all unpaid principal and interest are "due and payable in full no later than" September 16, 2014. (Doc. 43-1, at 8 ¶ 1; Doc. 43 ¶ 7; Doc. 43-1, at 3 ¶ 7; Doc. 43-2, at 3 ¶ 7; Doc. 64-1, at ¶ 7). And Paragraph 2 requires payment even earlier if the vehicles securing the loan are sold; in that event, "all principal and accrued interest *shall fall due and be payable in full* no later than at the sale of the last of the Securing Property described below." (Doc. 43-1, at 8 ¶ 2) (emphasis added). Defendants' position

---

[6] As noted, Paragraphs 3, 4, and 5 of the Loan Agreement pertain to the collateral for the loan. In Paragraph 3, Defendants grant Lender RBS a security interest in "the Securing Property" identified as two vehicles. (Doc. 43-1, at 8 ¶ 3; Doc. 64-1 ¶ 14). Under Paragraph 4, RBS "shall not cause its rights . . . to be registered or recorded as a lien . . . ." (Doc. 43-1, at 9 ¶ 4). And Paragraph 5 provides that RBS's interest in the Securing Property "shall be superior in priority to that of any equity partner, general or limited" and "equal . . . to that of each subsequent lender . . . ." (Doc. 43-1, at 9 ¶ 5).

7

that the Loan Agreement did not require repayment is further belied by their own responses to certain requests to admit in which they stated, for example, that "Roger Sippey, acting for RBS, *allowed* late payments from time to time and has never suggested that such *grace* has been withdrawn." (Doc. 43-5 ¶ 8) (emphasis added). Defendants' position is also undercut by the undisputed fact that they made "some" payments on the loan, most recently in October 2017. (Doc. 43 ¶¶ 11-12; Doc. 64-1 ¶¶ 11-12; Doc. 43-5 ¶¶ 4-6).

Notably, Defendants do not argue that the language in Paragraphs 1 and 2 is ambiguous. *See Urban 8 Fox Lake Corporation*, 431 F. Supp. 3d at 998-99 (citing caselaw explaining that, in Illinois, courts interpret the meaning of unambiguous contract terms as a matter of law and that the parties' disagreement as to a provision's meaning does not render a contract ambiguous). Nor do Defendants proffer authority that the language in this Loan Agreement was insufficient to obligate them to repay the loan. Defendants cite *Strosberg v. Brauvin Realty Servs., Inc.*, 691 N.E.2d 834 (Ill. App. Ct. 1998), without explanation but purportedly in support of their assertion that, "[i]n the absence of such a promise/undertaking, there can be no liability." (Doc. 64, at 2). *Strosberg* did not address any requirements as to the language of a loan agreement but rather the enforceability of a promissory note.[7]

---

[7] *Strosberg* involved (in relevant part) a dispute about the enforceability of three promissory notes (negotiable instruments under Article 3 of the UCC). 691 N.E.2d at 836, 839. The court said that the plaintiff did not (and could not) seek to enforce the first note, which had been lost and superseded by two subsequent notes. *Id.* at 839. The court explained that the second note (issued after the first was lost) was not effective because it had not been signed by the defendant. *Id.* As for the third note (that replaced and superseded the second one), the court found that the plaintiff could not enforce it because he did not possess it after transferring it (and his non-possession was not the result of a wrongful possession). *Id.* at 838-40, 844-45.

Defendants conclude their "no promise" analysis with this cursory and confusing argument:

> UCC § 3-103(a)(9) bars any imputation that an acknowledgement is an enforceable promise. Clearly, the document was intended to be accompanied by a promissory note. No such note has not been produced as required by 740 ILCS 80/1. There is no promise or undertaking to be enforced.

(Doc. 64, at 2-3). Defendants fail to develop or support, and therefore waive, this perfunctory argument. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016). And their suggestion that the Frauds Act (740 ILL. COMP. STAT. 80/1) "require[s]" the production of a promissory note (Doc. 64, at 3) is wrong. The statute bars an action upon an agreement that cannot be performed within one year from its making "unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith . . . . " 740 ILL. COMP. STAT. 80/1; *see Flair Airlines, Ltd. v. Gregor LLC*, No. 18 C 2023, 2019 WL 2601312, at *4 (Jun. 25, 2019) ("In Illinois, a contract must be in writing unless it is capable of being fully performed within one year."). Here, there is a "writing" that was signed by both parties—the Loan Agreement. (Doc. 43-1, at 8-9; Doc. 43 ¶ 6; Doc. 43-1, at 3 ¶ 6; Doc. 43-2, at 3 ¶ 6; Doc. 64-1 ¶ 6). The Loan Agreement itself does not reference a separate promissory note. (*See* Doc. 43-1, at 8-9). And Defendants adduce no evidence whatsoever of the existence of a separate (but unproduced) note.

### 2. Repayment of Loan is Not Due Until Sale of Securing Property

Defendants next argue that, even if Loan Agreement contains a promise to repay the loan, they have not breached because the Agreement does not require repayment until the security for the loan has been sold. (*See* Doc. 64, at 3). This Court disagrees.

9

While the Loan Agreement is no model of draftsmanship, Paragraph 1 (quoted in full above) establishes a date certain (September 16, 2014) by which all unpaid principal and interest were due. (Doc. 43-1, at 8 ¶ 1; Doc. 43 ¶ 7; Doc. 43-1, at 3 ¶ 7; Doc. 43-2, at 3 ¶ 7; Doc. 64-1, at ¶ 7). Defendants rely on the language in Paragraph 2, which *permits* Defendants to make prepayment of principal or interest without penalty but nonetheless *requires* prepayment in the event of the sale of all collateral. (Doc. 43-1, at 8 ¶ 2) ("Borrowers may pre-pay all or any part of the borrowed funds or accrued interest at any time without penalty: however, all principal and accrued interest shall fall due and be payable in full no later than at the sale of the last of the Securing Property described below.") This means that had Defendants opted to sell the two vehicles securing the loan a mere month after obtaining it, they would have been required to repay the entire loan at that time and long before September 16, 2014.

Defendants reach a different conclusion based on the following analysis quoted in its entirety:

> Even if the language stated a promise or undertaking, there is no provision in the document presented for acceleration, and the latter due date modifies the former under fundamental rules of contract interpretation. *Northwest Racing Association v. Hunt,* 20 Ill. App.2d 393, 156 N.E.2d 285 (2 Dist. 1959), citing *Shell Oil Co., Inc. v. Blumberg*, 154 F.2d 251 (5 Cir. 1946). The affidavit of David Cooper demonstrates that the vehicles have not been sold. The due date, as modified by paragraph 2, has not arrived. Under either analysis, defendants have broken no promise.

(Doc. 64, at 3).[8] Defendants do not bother to explain how *Northwest Racing Association v. Hunt* supports their contention, however, and examination of the case reveals that it

---

[8] Cooper attested that, as of October 21, 2019, the vehicles constituting the Securing Property had "not been sold" and were "still undergoing restoration." (Doc. 64-1 ¶¶ 14, 15; Doc. 64-3 ¶ 4).

does not. There, in the course of construing a lease agreement, the court observed that "where there are two clauses in a contract which are so entirely repugnant to each other that they cannot stand together, the first shall be received and the latter rejected." *Nw. Racing Ass'n*, 156 N.E.2d at 288. But here, the due date provisions in Paragraphs 1 and 2 of the Loan Agreement are not inconsistent with, much less "entirely repugnant" to, each other. And even if they were, the application of the rule articulated in *Northwest Racing Association* would mean that the due date in Paragraph 1 (September 16, 2014) would be "received" and the due date in Paragraph 2 (tied to the sale of the collateral) would be "rejected." Illogically, Defendants ask this Court to find the exact opposite by disregarding the due date in Paragraph 1 and applying only Paragraph 2.

Again, Defendants do not claim that the Loan Agreement is ambiguous as to the due date for repaying the loan. *See Urban 8 Fox Lake Corporation*, 431 F. Supp. 3d at 998-99. Plainly, the due date provisions in Paragraphs 1 and 2 can and should be read together, so there is no basis to "modify" the due date in Paragraph 1, as Defendants argue. Under the construction of the Loan Agreement that Defendants urge, the obligation to repay the loan in full would not arise until some indeterminate time in the future—whenever Defendants should decide to sell the Securing Property—or perhaps never should they decline to sell the vehicles. This was not the bargain reached by the parties under the Loan Agreement, so is rejected.

### 3. Case is Not Ripe Absent Presentment and Notice of Dishonor

Defendants also oppose summary judgment on the ground that the case is not yet "ripe." (Doc. 64, at 4) ("As a matter of law, even assuming that there is some enforceable obligation, this action would still not have been ripe when filed as there had been no

presentment and no dishonor."). Defendants offer scant explanation and no caselaw in support of this conclusion, observing:

> The concepts of presentment and notice of dishonor have largely passed into history, not because they are no longer the law, but because most promissory note forms contain language similar to "Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor.[1] [Footnotes 1 states "Taken from a form used in the office of defendants' counsel."]

(*Id.* at 3.) Defendants also provide no context or analysis, simply noting that "[t]he rules governing presentment and dishonor appear in the UCC" and then block quoting various provisions of Article 3. (*Id.* at 3-4, quoting 810 ILL. COMP. STAT. 5/3-501 and 5/3-504).

But the Loan Agreement does not contain the terms "presentment" or "notice of dishonor" and does not reference the UCC. (*See* Doc. 43-1, at 8-9). To the extent Defendants contend that Article 3 (or any other Article) of the UCC generally applies here (and they do not expressly say this), they must, of course, provide supporting analysis and authority. They also must explain why specific UCC provisions apply and describe what they require under the circumstances in this case. Defendants have done none of this. For example, Defendants block quote a provision that begins: "(b) The following rules are subject to Article 4, agreement of the parties, and clearing-house rules and the like . . . . " (Doc. 64, at 3, quoting 810 ILL. COMP. STAT. 5/3-501).[9] Defendants do not

---

[9] Immediately after that sentence, Defendants continue to quote a provision setting forth how to accomplish "presentment" as follows:

> (1) Presentment may be made at the place of payment of the instrument and must be made at the place of payment if the instrument is payable at a bank in the United States; may be made by any commercially reasonable means, including an oral, written, or electronic communication; is effective when the demand for payment or acceptance is received by the person to whom presentment is made; is effective if made to any one of 2 or more makers, acceptors, drawees or other payors.

discuss what Article 4 covers (it appears to be bank deposits and collections), and they do not attempt to explain how (if at all) those rules apply to the Loan Agreement. Notably, Defendants also say nothing about what, in their view, Plaintiff should have done (but did not) to satisfy any "presentment" or "notice of dishonor" requirements. Absent such analysis, Defendant's underdeveloped and unsupported arguments are not only unpersuasive but waived. *See Crespo*, 824 F.3d at 674.

### 4. Trust Does Not Exist

Defendants devote the bulk of their opposition brief to opining generally on the history of the law of trusts. (Doc. 64, at 4-6). They conclude that the Trust was not validly funded under Florida law so does not exist, and "there is no plaintiff in this case." (*Id.* at 6-8). In reply, Plaintiff argues that the evidence establishes that the Trust was properly funded, Defendants waived this "standing defense" by failing to raise it previously as an affirmative defense, and Defendants lack standing to challenge the existence of the Trust (under Illinois law). (Doc. 66, at 2-3, 5). Because Defendants fail to demonstrate that the Trust was not properly funded, the Court rejects the argument that Plaintiff does not exist.

The Sippeys executed the Trust in November 2017. (Doc. 65, at 3, 29; *see* Doc. 64-4, at 11). It conveys assets to the couple for distribution to either or both while they are alive, to the surviving spouse in trust upon the other's death, and to their children in trust upon the death of the surviving spouse. (*See* Doc. 65, at 4-6, 8-9, 11-12). The first page of the document (under the heading "Initial Principal and Additions") states:

> We hereby delivered to the trustees as the initial trust principal the sum of one dollar. Such principal and additions to this

---

(Doc. 64, at 3, quoting 810 ILL. COMP. STAT. 5/3-501). Defendants also quote provisions addressing when "presentment" and "notice of dishonor" are "excused." (Doc. 64, at 4, quoting 810 ILL. COMP. STAT. 5/3-504).

> revocable trust shall be allocated and administered as follows
> . . . .

(Doc. 65, at 3; *see* Doc. 64-4, at 11). At his deposition, Sippey confirmed that he and his wife initially funded the Trust with $1.00, with the next funding or injection of funds within 90 days. (Doc. 64-4, at 11, 14-15).

As with Defendants' other arguments, this one is long on general discussion (here, about the history of trusts) but short on analysis and supporting authority. (*See* Doc. 64, at 4-6). Defendants quote at length from Sippey's deposition regarding the payment of $1.00 to initially fund the Trust. (Doc. 64, at 6-8).[10] They then assert that $1.00 does not

---

[10] The pertinent exchange at Sippey's deposition follows:

> Q: Now the -- when is the trust, which is the plaintiff in this lawsuit, funded?
> A. 2017.
>
> Q. Can you narrow it down?
> A. The trust was established -- I believe it's in our papers.
>
> Q. I'm not trying to trip you up. The trust was established according to what I have November 15th, 2017.
> A. Okay. That's when it was initially funded with a dollar and then assets were put in after the trust was established.
>
> Q. Okay. It was funded with a dollar?
> A. Yes.
>
> Q. Okay. What was done with that dollar?
> A: It's still in there.
>
> Q. In where?
> A. The trust.
>
> Q. Well, I'm asking did you open an account with that dollar?
> A. The trust -- The trust was funded with a dollar. My assets were then put into -- my wife's and my assets were then put into the trust.
>
> Q. Okay. How is the dollar conveyed to the trust?
> A: I can't answer that. I don't know.
>
> Q. Was it your wife's dollar? Was it your dollar?
> A. It would have been both of ours.
>
> Q. Okay. Were you conscious of parting with a dollar?
> A. No.

(Doc. 64-4, at 10-12).

14

qualify as the "identifiable property" of a trust, as required under Florida law (which the Court agrees governs here), because:

> Florida law is clear on what is and is not "identifiable property." The dollar was and remained theoretical and fungible, the opposite of the definition of identifiable property. As such, no tripartite relationship was established among trustee, property and beneficiary. Without that relationship, there is no trust and there is no plaintiff in this case.

(Doc. 64, 8; *see* Doc. 65, at 29). But Defendants offer no definition of the term "identifiable property" and provide no authority specifying the requirements of "identifiable property." Nor do Defendants cite any caselaw (from Florida or elsewhere) holding that $1.00 does not constitute "identifiable property" to create a trust. Instead, they quote portions of the Florida Trust Code without elaboration on specific language and how it supports their position. (Doc. 64, at 6). For example, Defendants quote a provision stating that (among other methods) "[a] trust may be created by . . . [d]eclaration by the owner of property that the owner holds identifiable property as trustee[.]" (Doc. 64, at 6, citing F.S.A. § 736.0401(2)).

Defendants' sole citation (without any discussion) to *Finkelstein v. Southeast Bank, N.A.*, 490 So.2d 976 (Fla. App. Ct. 1986) (Doc. 64, at 6), is unavailing. That case was about the ability of a bank to prevent—by the entry of an injunction or the imposition of a constructive trust—the dissipation of funds held in a family trust in connection with the bank's lawsuit to recover monies lost in violation of Florida's Racketeer Influenced Corrupt Organization and Anti-Fencing Acts. *Finkelstein*, 490 So.2d at 978, 983. The court there concluded that the bank was not entitled to an injunction or a constructive trust. *Id.* at 984. With regard to a constructive trust, the court explained that such remedy requires finding that specific property was the subject of an "inequitable transaction" and stated

15

that " . . . it is well settled that Florida courts will impress property with a constructive trust only if the trust res is specific, *identifiable property* or if it can be clearly traced in assets of the defendant which are claimed by the party seeking such relief." *Id.* at 983 (emphasis added). That is the context in which the *Finkelstein* court referenced "identifiable property," which is wholly unrelated to the issues in this case. The case thus provides no guidance on the meaning of what constitutes "identifiable property" for the purpose of formation of a trust and, as a result, compels no conclusion that identifiable property was lacking in forming the Trust here.[11]

### 5. Validity of Assignment of Loan Agreement from RBS to Trust

One final topic requires discussion. Defendants' Answer to First Amended Complaint raised an affirmative defense (Doc. 14, at 4-5; Doc. 34), which Plaintiff argues is no longer valid (Doc. 44, at 3, 6), and which Defendants have not asserted it in defense of summary judgment. Specifically, Defendants previously raised the affirmative defense of *ultra vires*, which hinged on the Assignment of the Loan Agreement from RBS to the Trust being executed at a time when RBS had been administratively dissolved by the Illinois Secretary of State. (*See* Doc. 14, at 4-5; Doc. 64, at 1-2). In May 2019, the district judge declined to strike this affirmative defense that the Assignment was "void based on the timeline when the Assignment was made relative to RBS's winding up." (Doc. 34, at

---

[11] Defendants also quote another provision stating that (among other things) "[a] judicial proceeding involving a trust may relate to the validity, administration, or distribution of a trust, including proceedings to . . . [d]etermine the validity of all or part of a trust[.]" (Doc. 64, at 6, quoting F.S.A. § 736.0201(4)(a)). Defendants do not explain the relevance, but seem to suggest that this Court may conduct proceedings about the validity of the Trust. The Court notes that the statute also provides that "[t]he court may intervene in the administration of a trust to the extent the court's jurisdiction is invoked by an interested person or as provided by law." F.S.A. § 736.0201(2). Defendants fail to address whether proceedings to determine a trust's validity must be brought by "interested person[s]" and, if so, whether they qualify as interested persons permitted to challenge the Trust's validity. The Court need not address these questions to resolve the pending motion and expresses no view as to whether Defendants are "interested persons" under Florida law.

16

4). Then, on June 26, 2019, the Illinois Secretary of State reinstated RBS, and it is presently an active limited liability company ("LLC"). (Doc. 43-4, at 2; Doc. 43 ¶ 10; Doc. 64-1 ¶ 10).[12]

In his opening memorandum in support of summary judgment, Plaintiff argued that, as a result of RBS's reinstatement, the previously-executed Assignment subsequently was "'ratified and confirmed.'" (Doc. 44, at 3, 6, quoting 805 ILL. COMP. STAT. 180/35-40(d); Doc. 66, at 4).[13] While critical of Plaintiff for seeking to sue under the Assignment prior to the reinstatement of RBS, Defendants acknowledged the ratification, and opted not to oppose summary judgment based on the affirmative defense.[14]

### D. Court's Ruling on Summary Judgment

The facts in this case are straightforward: Defendants entered into the Loan Agreement with RBS to borrow $105,000 and repaid some, but not all, of the loan; and RBS assigned the Loan Agreement to the Trust. No material facts are disputed.

---

[12] Business records available online on the Illinois Secretary of State website currently show RBS's status as "active," provide a Florida address for its principal office, and identify Sippey as its manager. *See* https://www.ilsos.gov/corporatellc/CorporateLlcController (last visited December 7, 2020). The Court may take judicial notice of this filing as a matter of public record. *See Farag v. Health Care Serv. Corp.*, No. 17 C 2547, 2017 WL 2868999, at *13 (N.D. Ill. July 5, 2017).

[13] Section 180/35-40 provides that, upon the filing of an application for reinstatement, the existence of an administratively dissolved LLC "shall be deemed to have continued without interruption from the date of the issuance of the notice of dissolution, and the limited liability company shall stand revived with the powers, duties, and obligations as if it had not been dissolved; and all acts and proceedings of its members, managers, officers, employees, and agents, acting or purporting to act in that capacity, and which would have been legal and valid but for the dissolution, shall stand ratified and confirmed." 805 ILL. COMP. STAT. 180/35-40(a), (c), (d).

[14] Defendants' response states:

> RBS had no capacity to transfer any obligation, not at the time when plaintiff concocted the story that one of many directions to change the payee was an assignment, nor when the document of assignment was signed, nor when this action was filed, nor when the Amended Complaint was filed. The assignment may be ratified, but the statements to the Court cannot be unsaid.

(Doc. 64, at 1-2).

17

Defendants various arguments are mostly unsupported, undeveloped, and—ultimately—unpersuasive. Because Plaintiff has established the existence of a valid and enforceable contract, substantial performance by Plaintiff, and breach by Defendants, the Court finds that Plaintiff is entitled to summary judgment for breach of contract as to liability.

Plaintiff has not, however, proffered a damages calculation. To recover for breach of the Loan Agreement, Plaintiff must submit proof of damages. *See UMB Bank, National Association v. Leafs Hockey Club, Inc.*, No. 13 C 2247, 2015 WL 2258461, at *1-2 (N.D. Ill. May 11, 2015) (granting plaintiff's motion, supported by affidavit and underlying documentation, to prove up damages on breach of contract claim as to principal and interest following entry of summary judgment for plaintiff as to liability); *see also Boatman's First Nat'l Bank of Kansas City v. Wabick*, No. 94 C 7486, 1996 WL 341451, at *3 (N.D. Ill. Jun. 19, 1996) (concluding lack of proof of total amount of damages had no bearing on issue of liability, granting motion for summary judgment, and directing plaintiff "to file an affidavit of prove-up, including a statement of damages"); *Scavenger Sale Investors L.P. v. Bryant,* No. 99 C 3355, 2000 WL 360118, at *1, 5 (N.D. Ill. Mar. 22, 2000) (granting plaintiff's motion for summary judgment on issue of liability for breach of loan agreement and setting hearing on issue of damages).

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 41) is granted as to liability. Plaintiff must file a motion to prove up damages by January 6,

2021. Defendants' response is due by January 20, 2021, and Plaintiff's reply (if any) is due by January 27, 2021.

                                              ENTER:

Dated: December 7, 2020                     _____
                                              SHEILA FINNEGAN
                                              United States Magistrate Judge